**STATE**

v.

**Adrian BUSTAMANTE.**

No. 97–32–C.A.

Supreme Court of Rhode Island.

Aug. 2, 2000.

Aaron L. Weisman, Lauren Sandler Zurier, Providence, for plaintiff.

Catherine Gibran, Paula Rosin, Public Defenders Office, for defendant.

Adrian Bustamante, defendant, pro se.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Supreme Court on the appeal of Adrian Bustamante (Bustamante or defendant) from judgments of conviction for murder in the first degree and conspiracy to murder following a jury trial in the Providence County Superior Court. The defendant was sentenced to a term of life imprisonment without parole and to a concurrent ten-year sentence for conspiracy to murder.

## FACTS AND TRAVEL

On December 2, 1994, the police in Bellingham, Massachusetts, responded to a call from a passing motorist that resulted in the discovery of a body in a ditch near the side of the road in the area of Lake and Cross Streets. Thus, the events leading up to a gruesome murder began to unfold. The body later was identified as twenty-four-year-old John Casserly (Casserly) of Woonsocket, Rhode Island, who died as the result of multiple stab wounds after a severe beating. With the body, police recovered three pairs of blue jeans, a blue blanket, a sleeping bag, and other items of clothing.

The circumstances leading up to the savage murder of Casserly stemmed from his ill-advised and random contact with an unsavory band of delinquents. The individuals who comprised this self-described gang[1] mainly were teenagers, although the ringleader of this crew was apparently Charles Roy, known to the group as "Uncle Chuck," a man in his mid-thirties. The trial testimony revealed that on December 1, 1994, this confederacy of hoodlums ultimately would be responsible for Casserly's brutal murder. At trial, testimony established that on the afternoon of December 1, 1994, Uncle Chuck called his nephew, Charles Roy, Jr., known also as "Little Chuckie," age sixteen, and requested that he assemble his cohorts in Milford, Massachusetts, because Uncle Chuck wanted to "beat up some guy." Apparently, Uncle Chuck wanted Little Chuckie and his friends to assault or, according to some accounts, to stab a man who allegedly had "ratted" on neighbors of Uncle Chuck's, Carlo Belloli (Belloli) and his girlfriend Nora Solomon (Nora), causing Nora to land in jail. Little Chuckie complied with the request and gathered his soldiers to accomplish Uncle Chuck's vindictive objective. Composed of juveniles, the group included Rob Pointer (Pointer), Jesse Kegley (Kegley), Danny Dunbar (Dunbar), Little Chuckie's brother Michael Roy (Mikey),

Luis DeJesus (Luis), and Timmy Gorman (Timmy), a twelve-year old. Uncle Chuck, accompanied by Belloli and fifteen-year-old Rene "Buzzy" Gorman (Buzzy), arrived in Milford in a van and transported the gang, first to a liquor store, then to Uncle Chuck's house at 706–08 Bernon Street in Woonsocket. Little Chuckie, Buzzy, Dunbar and Timmy all testified at trial, and although their testimony was at variance at some points, the witnesses were fairly consistent in their accounts of the events of that evening.

Uncle Chuck's house on Bernon Street shared a backyard with Belloli's house at 181 Paradis Avenue, Woonsocket, the scene of the murder. In addition to a common backyard, Belloli's and Uncle Chuck's homes were connected with an intercom system that allowed the occupants of one home to "buzz" the neighbors to communicate with one another. At some point, the plan to beat up the intended victim was aborted, and the group proceeded to consume the alcohol, and some of them consumed cocaine. Evidently, according to the testimony of Buzzy, Uncle Chuck had made arrangements for his guests to be tattooed that evening and had invited a tattoo artist, Bustamante, who was from Vermont and known simply as "Ponch," to Rhode Island to execute the tattoos.

Meanwhile, Casserly, a stranger to this brotherhood, had spent the evening at a pub in Woonsocket with his friend, Scott Deering (Deering). Deering testified that at around six or seven p.m., they left the pub, purchased cocaine off the street, and walked to Deering's house, where he and Casserly smoked the cocaine and drank beer. Deering said that after consuming the cocaine, he and Casserly left at approximately 11 p.m. to purchase more cocaine. Because neither had a car, Casserly and Deering walked to the vicinity of the place they previously had acquired cocaine and encountered two men "going to

---

**1.** We note that at trial, certain members of the group referred to themselves as a gang.

the bathroom outside their van." Deering testified that he and Casserly approached the two individuals and struck up a conversation with them, at which point the two asked Deering whether he could secure some cocaine. Deering agreed. According to Deering, he and Casserly entered the van, they bought more cocaine and returned to Deering's house to consume it. Deering testified that the four men drank beer and partied, but that he "didn't like the way they were acting, so [he] did the drugs fast and * * * wanted them to leave." Deering testified that he cautioned Casserly against leaving with the men, and advised him that "we have to work in the morning," and that "[i]t's late[,] I think we [have] had enough." However, Casserly disregarded his friend's advice and departed with the men at 1 or 1:30 a.m. Deering never saw Casserly again. He testified that he was subsequently contacted by the Woonsocket police about the events of that evening. He provided a witness statement and identified Charles Roy (Uncle Chuck) as the passenger in the van from a photographic array, but was unable to positively identify Belloli as the driver or the person with whom he had smoked cocaine on that fateful night.

Crew member Buzzy testified that he was back and forth between Uncle Chuck's house and Belloli's house, and that at some point Uncle Chuck, Belloli, defendant and Casserly were at Belloli's house drinking. He said that with the exception of defendant, everyone used cocaine, including Buzzy. Later that night, Buzzy, defendant and Casserly left in Belloli's van to purchase more cocaine. It was the events of this buying trip that led to the carnage. Buzzy testified that Belloli gave defendant $100 to purchase cocaine, and that defendant gave the money to Casserly. The trio, with defendant at the wheel, proceeded first to Casserly's house, where Casserly obtained a check for $20 from his mother. This testimony was substantiated by Casserly's mother, who testified that between 1:30 a.m. and 3 a.m., she was roused

from sleep by her son, who asked her for money. After giving him a check for $20, she watched her son leave; she never saw him again.

Buzzy further testified that the group then proceeded to Front Street in Woonsocket, at which point defendant and Casserly exited the vehicle, leaving Buzzy behind. About one-half hour later, the men returned to the van and Casserly informed Buzzy that they had been "ripped off," a sentiment reiterated by defendant. Buzzy testified that at that point he and defendant forced Casserly into the back of the van. The trio returned to Belloli's house without the cocaine, all the while shouting back and forth, with Buzzy and defendant questioning Casserly on the whereabouts of the money, and Casserly responding that he was "ripped off." Casserly was escorted into Belloli's house, where Uncle Chuck and Belloli were waiting for the cocaine. Buzzy told them that there was no cocaine, and defendant declared that Casserly had "ripped them off." It was at that point, according to Buzzy, that the onslaught began.

Buzzy testified that he, defendant, Luis, Belloli and Uncle Chuck all were present and accounted for during the early stages of the vicious attack upon Casserly. Buzzy described the sequence of events and admitted that he was the first to strike Casserly, followed by Belloli, who violently propelled Casserly to the floor, at which point the group kicked him until he appeared to be unconscious. At that point, according to Buzzy, defendant repeatedly struck Casserly with first a beer bottle and then with a flashlight, all the while screaming about the money. Casserly apparently regained consciousness, because he replied that he did not steal the money. Buzzy also admitted that he struck Casserly with the flashlight "once or twice." At some point Buzzy was called on the intercom system (either once or twice) and directed to report next door to tell Uncle Chuck what was happening. Significantly, Buz-

zy[2] testified that although Uncle Chuck was present at the end of the attack, when the group prepared Casserly's body for disposal, he was not there in the interim, when the weapons were being used. According to Buzzy, Uncle Chuck was conveniently next door.

Buzzy testified that when he returned, he observed Casserly get up from the floor and wrestle with Belloli, who in the interim had obtained a weapon from the back room, described as a small survival knife. According to Buzzy, Belloli stabbed Casserly at least ten times. During his testimony, Buzzy described Casserly as begging both Belloli and defendant to stop the attack, stating "[s]top[,] I can't breathe." Buzzy recalled seeing three knives during the attack: the survival knife, a steak knife, and a chrome knife with a black handle. In addition, Buzzy stated that defendant joined in the attack and stabbed Casserly in the back of his legs under his buttocks. Buzzy also implicated Luis, testifying that he grabbed a knife and stabbed Casserly three times. At some point, Belloli retrieved a blanket and threw it down next to Casserly, and told him to "[b]leed on the blanket[,] not on the rug."

Little Chuckie also testified about his involvement in this heinous murder. He said that he and Timmy were asleep at Uncle Chuck's when Buzzy and Luis arrived and awakened them. He went to Belloli's house and watched defendant, Buzzy and Luis viciously attack the victim. Little Chuckie added that at one point during the assault, defendant handed twelve-year-old Timmy a pocket knife and told him to stab the body "if it makes you feel good." According to Little Chuckie, Timmy complied. Little Chuckie also testified that Uncle Chuck was not present

during the attack, but was home in bed with his young son.

Twelve-year-old Timmy also testified. He said that after being awakened at Uncle Chuck's, he watched the fatal assault on Casserly. He confirmed that defendant handed him a knife at the end of the attack and stated, "[y]ou know what you have to do." Timmy testified that although he tried, he could not stab Casserly. Both Timmy and Little Chuckie testified that Belloli threatened to kill them if they said anything to anyone concerning the events of that evening.

Uncle Chuck appeared on the scene at some point and ordered someone to bring a blanket to wrap up the body for disposal. The corpse was wrapped in a blanket, loaded into the van and transported by Belloli, Buzzy and Luis to Bellingham, Massachusetts, where, according to Buzzy, Belloli dumped Casserly's blanket-wrapped body and some blood-stained clothing into a ditch by the side of the road.

Socorro Caro (Caro), who lived in a third floor apartment at 181 Paradis Avenue, also testified. She said that while she was making breakfast, at approximately 6:15 a.m., she looked out the window and saw a van back up to the rear door of her building. She testified that she then saw Belloli and Uncle Chuck carrying what looked like a rolled-up carpet from the house to the van.

Ellen Keefe (Keefe) worked in the probation department of the Framingham District Court, and knew both Belloli and Nora.[3] Keefe testified that on December 2, 1994, Belloli appeared at the courthouse concerning a matter involving Nora. Keefe testified that Belloli appeared di-

---

2. Buzzy, who was fifteen years old at the time of the incident, admitted to a lesser charge of assault with a dangerous weapon, and was serving some portion of his twenty-year sentence at the training school. It was revealed at trial that in exchange for his cooperation and truthful testimony at any hearing relating to the matter of Carlo Belloli and Adrian

Bustamante, the Attorney General's office would recommend that the remainder of his sentence, after his twenty-first birthday, be suspended with probation.

3. Although at trial Nora was often referred to as Belloli's wife, they were not married.

sheveled and frantic and had a strong odor of alcohol on his breath. When she asked Belloli what was wrong, he displayed his blood-stained hands and disclosed that he had "stabbed someone to death." Keefe further testified that after directing Belloli to wait in a vacant courtroom, she informed her boss of the conversation, and that her boss called the Framingham Police Department. But by that time, Belloli had left the building.

Almost immediately after the discovery of Casserly's body in Bellingham, the police were informed that a possible suspect had been identified in Framingham. Belloli was thereafter taken into custody and charged with Casserly's murder. Arrest warrants also were issued for defendant, Uncle Chuck and Luis.

Leonard Atkins, M.D. (Dr. Atkins), the medical examiner in Suffolk County, Massachusetts, performed the autopsy on Casserly's body, and described the horrific injuries suffered by Casserly. The record discloses that Casserly had been stabbed a total of twenty-seven times, and that any one of six severe stab wounds perforated the aorta, causing massive bleeding and death. One stab wound perforated the heart, and numerous stab wounds perforated Casserly's intestines, kidneys and lungs. In particular, Dr. Atkins described one of the wounds as a double thrust wound, indicating that the assailant had stabbed Casserly, pulled out the knife, and then thrust it back in. Also noted were numerous abrasions and lacerations to Casserly's head, shoulder and eye area consistent with the heel of a shoe. Further, Dr. Atkins identified other injuries consistent with Casserly's body being kicked and dragged, and he noted the presence of defensive wounds on his forearm. Doctor Atkins testified that a postmortem blood test revealed the presence of cocaine and alcohol in Casserly's blood.

Beginning on February 19, 1996, the case against defendant and co-defendant Belloli was tried to a jury. On March 1, 1996, the jury returned guilty verdicts against both defendants for the crimes of murder and conspiracy to murder. Following reinstruction, the jury further found that both defendants had committed the murder under circumstances involving torture and aggravated battery. The defendant has appealed. In support of his appeal, defendant raised numerous issues that will be considered in the order in which they appear in defendant's brief. Additional facts will be supplied as they are necessary to the issues raised in this appeal.

## DISCUSSION

### I

### State of Mind Evidence

Before this Court, defendant contended that the trial justice erred by excluding from evidence statements he made to members of the Woonsocket Police Department who transported defendant to Rhode Island from his home in Vermont after he waived extradition. According to defendant, these statements were evidence of his state of mind at the time and reflected a consciousness of innocence, and that he should have been allowed to introduce them to rebut the inference of consciousness of guilt that arose as a result of his flight to Vermont.

Although defendant was permitted to call Sergeant Walter Warot (Sgt.Warot) of the Woonsocket Police Department, and elicit from him a description of defendant's agitated state as he was being transported back to Rhode Island,[4] the trial justice refused to allow Sgt. Warot to testify about statements defendant made concerning the reasons for his agitation. The defendant asked Sgt. Warot, "[d]o you recall him repeatedly saying that they were

---

4. Sergeant Warot testified that defendant was upset, combative, violent, agitated, and frantic. Also, he testified that "[h]e was very

upset. He didn't want to go back to the [s]tate."

going to kill him?" Thereafter, the trial justice sustained the prosecution's objection as leading, despite defendant's argument that he should be permitted to lead the witness pursuant to Rule 611(c) of the Rhode Island Rules of Evidence, a contention defendant has renewed on appeal. Moreover, defendant argued that the trial justice erred in excluding this evidence because it was competent evidence of his state of mind under Rule 803(3) of the Rhode Island Rules of Evidence,[5] namely his fear of returning to Rhode Island because he believed he would be killed by Uncle Chuck and his gang of vagabonds.

■ The trial justice concluded that this line of inquiry would permit defendant to introduce his own statements into evidence without taking the stand, thus depriving the prosecutor of the opportunity to cross-examine the proponent of those statements, defendant himself. Furthermore, the trial justice concluded that, assuming defendant's state of mind during this return trip was relevant, the proffered evidence could just as easily have been interpreted as circumstantial evidence of defendant's guilt, because "[h]e doesn't want to come back to Rhode Island and face the music." We agree with the trial justice that this evidence is capable of conflicting inferences and constitutes impermissible hearsay.

In contending that these statements were admissible pursuant to Rule 803(3) to show his state of mind, defendant made an offer of proof based on a report made by Sgt. Warot that indicated defendant was in fear of returning to Rhode Island because he was an innocent bystander who saw too much. Although this evidence may have been relevant to rebut a suggestion of consciousness of guilt arising from defendant's flight to Vermont following the murder, the trial justice properly excluded it as a violation of Rule 803, finding that this was an attempt by defendant to introduce testimony before the jury without testifying in his own behalf and subjecting himself to cross-examination.

■ The defendant's assertion that these statements rebutted an inference of consciousness of guilt which could be drawn from his "flight" back to Vermont after the murder is without merit. We note that there was no flight instruction given in this case, and that the jury was not asked to consider defendant's return to Vermont for any reason. Further, any evidence of defendant's flight was introduced during defendant's case-in-chief through the testimony of defendant's fiancee, Lisa Welch. We are satisfied that these statements constitute impermissible hearsay and reflect an improper attempt by defendant to place these statements before the jury as part of his defense under the guise of Rule 803(3). Although it is permissible for a defendant to introduce testimony concerning his or her state of mind, it is not permissible for "the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind." *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir.1980).

Finally, because we are of the opinion that these statements constituted inadmissible hearsay, we need not address whether the trial justice erred by not permitting defendant to propose leading questions to Sgt. Warot.

---

5. Rule 803 of the Rhode Island Rules of Evidence provides in pertinent part:

"**Hearsay exceptions; availability of declarant immaterial.**—The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
* * *
(3) *Then Existing Mental, Emotional, or Physical Condition.* A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

## II

### Limitation of Cross–Examination

Next, defendant argued that the trial justice committed reversible error by limiting defendant's cross-examination of a prosecution witness concerning his possible bias, thereby depriving defendant of his right to confront and cross-examine one of his principal accusers. Specifically, defendant contended that the trial justice erred by not permitting inquiry into Timmy Gorman's expectation of favorable treatment in exchange for his testimony with respect to pending Massachusetts juvenile charges.

During cross-examination of Timmy, defendant established that the witness had been "adjudicated delinquent to the offense of indecent assault and battery on a child," and on the same day was "also committed for an offense of assault and battery." In addition, Timmy admitted that the Massachusetts authorities were aware of his cooperation in a murder case in Rhode Island. However, when defendant sought to inquire about Timmy's expectation of favorable treatment in those pending petitions, he was not permitted to do so. In particular, the trial justice stated, "[y]ou can ask him if he's been promised anything but his hopes and desires have no bearing on this case." It is this ruling by the trial justice that defendant asserted as error, contending that a witness's subjective expectations or hope of favorable treatment or leniency is an appropriate inquiry on cross-examination. We agree.

The Sixth Amendment to the United States Constitution guarantees that "the accused shall enjoy the right * * * to be confronted with the witnesses against him [or her]." Similarly, the Rhode Island Constitution, Declaration of Rights, article 1, section 10, provides that "[i]n all criminal prosecutions, accused persons shall enjoy the right * * * to be confronted with the witnesses against them." It is well settled that "[i]ncluded in the right to con-

front witnesses is the fundamental right of the criminal defendant to cross-examine his or her accusers." *State v. Wiley*, 676 A.2d 321, 324 (R.I.1996) (quoting *State v. Olsen*, 610 A.2d 1099, 1101 (R.I.1992)). In addition, we have held that for cross-examination to satisfy constitutional guarantees, "the trial justice is required to afford the accused 'reasonable latitude' to establish or reveal bias, prejudice, or ulterior motives as they may relate to the case being tried." *State v. Hazard*, 745 A.2d 748, 756 (R.I.2000) (citing *State v. Brown*, 709 A.2d 465, 473 (R.I.1998)). Once sufficient cross-examination has been allowed and the constitutional safeguards are satisfied, any further cross-examination is within the sound discretion of the trial justice, and the trial justice's discretionary decision to limit the scope of cross-examination will not be disturbed absent a clear abuse of discretion. *Id.*

In *State v. Anthony*, 448 A.2d 744 (R.I. 1982), we recognized that a witness's expectations of a "deal" may color his or her testimony even when no such deal actually existed. Specifically, we held that "[t]he realm of counsel's inquiries is highly germane to the issue of [a witness's] motives in testifying on behalf of the prosecution. The crucial concern is not the actual existence of any such deals or understandings but the witness's own expectations and how they may have affected him." *Id.* at 756 (citing *United States v. Crumley*, 565 F.2d 945, 949–50 (5th Cir.1978)). We further noted that the reasonable latitude afforded a cross-examiner includes the opportunity for a defendant to establish or reveal possible bias, prejudice, or ulterior motives as they may relate to the case on trial. *Anthony*, 448 A.2d at 756 (citing *State v. Anthony*, 422 A.2d 921, 924 (R.I. 1980)).

Here, we are of the opinion that because defendant was denied an opportunity to inquire into Timmy's possible bias stemming from his subjective expectation of a "deal" or other favorable treatment, defendant's constitutional guarantees un-

der the Sixth Amendment and article 1, section 10, of the Rhode Island Constitution were impacted. We hold that a defendant ought to be granted wide latitude by the trial justice when inquiring into the possible bias, motive, or prejudice of a witness, including the witness's subjective expectations. Accordingly, we are satisfied that the trial justice erred in precluding this line of testimony.

■ However, in view of the extensive record of inculpatory evidence presented in this case, we are satisfied that this error was harmless beyond a reasonable doubt. In *State v. Texter*, 594 A.2d 376 (R.I.1991), this Court adopted the analysis enunciated by the United States Supreme Court in applying the harmless-error test to cases in which a defendant's constitutional rights have been violated. *Id.* at 378 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). This harmless-error analysis has been applied to situations in which there has been an impermissible restriction on the right of cross-examination. *Wiley*, 676 A.2d at 324. In determining whether error is harmless, we examine various factors, including the relative degree of importance of the witness testimony to the prosecution's case, "whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and * * * the overall strength of the prosecution's case." *Texter*, 594 A.2d at 378 (quoting *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438, 89 L.Ed.2d at 686–87).

In light of these factors and the extensive eyewitness testimony, we are satisfied that although error, the restriction placed upon defendant's cross-examination of Timmy was harmless beyond a reasonable doubt. As noted, there were multiple eyewitnesses who implicated defendant as one of the principal assailants in this massacre, including a detailed description of his participation in the crime. Thus, we conclude that Timmy's testimony was cumulative to the testimony of the other participants and eyewitnesses. Moreover, during his closing argument defendant emphasized to the jury that it was not Timmy but rather two other eyewitnesses on whose testimony the state rested its case, arguing that "[i]f you are to find Adri[a]n Bustamante guilty, you must [concern] yourself with two witnesses; Rene Buzz Gorman and Charles Roy, Jr., Little Chuckie. You *must* endorse *their* testimony. There is no other way." (Emphases added.) Clearly, in the eyes of both defendant and this Court, Timmy's testimony was cumulative in light of the overwhelming eyewitness testimony presented by the state. Accordingly, we conclude that the error of the trial justice restricting defendant's cross-examination was harmless beyond a reasonable doubt.

## III

### Conspiracy

■ At the close of the state's case, defendant's motion for judgment of acquittal for the crime of conspiracy was denied by the trial justice on the ground that, although this was not the "strongest conspiracy case [he had] ever heard," a jury reasonably could find the defendants guilty of conspiracy to murder Casserly. Before this Court, defendant argued that the evidence presented at trial was legally insufficient to establish that an agreement to murder Casserly was ever formed, much less that defendant was a member of the conspiracy. Specifically, defendant contended that a conspiracy to murder cannot exist when the agreement to kill was formed contemporaneously with the murder itself. Based upon the facts of this case, we disagree.

It is undisputed that the murder of John Casserly took place over a protracted period, during which the assailants inflicted increasingly serious blows to Casserly's body, eventually causing his death by stabbing. Standing alone, this evidence indicates more than a momentary resolve to

bring about the death of John Casserly on the part of all the assailants. Also, we note that at least one of the three knives used in the murder was retrieved from another room in the apartment and was used by more than one person. From these facts, a jury could find there was an implied agreement among his assailants to kill Casserly. Accordingly, we are satisfied that the state presented sufficient evidence to establish beyond a reasonable doubt that a conspiracy to kill Casserly existed, and therefore the trial justice properly denied defendant's motion for judgment of acquittal.

## IV

### Enlarged Photographs

■■■ Next, defendant argued that the trial justice committed reversible error by allowing as full exhibits four enlarged autopsy photographs. The state argued that the trial justice acted well within his discretion in admitting the enlargements for the purposes of illustrating the medical examiner's testimony and assisting the state in establishing the elements of torture and aggravated battery beyond a reasonable doubt. We agree. We have consistently held that it is within the trial justice's discretion "to determine the materiality or relevance of photographs." *State v. Tassone*, 749 A.2d 1112, 1119 (R.I.2000) (quoting *State v. Bettencourt*, 723 A.2d 1101, 1108 (R.I.1999)). Although gruesome, the photographs accurately represented the victim's condition following this brutal murder and were clearly relevant and necessary to the issue of torture and aggravated battery. Accordingly, we hold that the photographs were admissible at the trial court's discretion. *See Bettencourt*, 723 A.2d at 1108.

## V

### Motion to Sever

■■■ The defendant next argued that the trial justice's refusal to sever his trial from that of his co-defendant, Carlo

Belloli, constituted an abuse of discretion and resulted in a trial that was fundamentally unfair to defendant. This Court has long held that to be entitled to a severance from a co-defendant, a defendant must affirmatively demonstrate that he would otherwise suffer prejudice substantial enough to impinge on his right to a fair trial. *See State v. Vasquez*, 620 A.2d 1248, 1251 (R.I. 1993). It is not sufficient for a defendant to simply contend that he might have had a better opportunity for an acquittal had he been tried separately, *United States v. Leonard*, 494 F.2d 955, 968 (D.C.Cir.1974); rather, a defendant must affirmatively demonstrate the existence of compelling prejudice against which the trial court could not afford protection. *See State v. Cassey*, 543 A.2d 670, 674 (R.I.1988). Here, the trial justice, when denying the motion to sever, stated that he had "no qualms" about severing the case if something prejudicial arose during the trial. However, the issue of severance was not raised again, nor has defendant identified any specific instances of prejudice he purportedly suffered that resulted from the denial of his motion to sever. Accordingly, we are satisfied that defendant has failed to satisfy his burden of demonstrating that a compelling prejudice existed as a result of a joint trial or that such a trial actually prejudiced his defense. Therefore, we conclude that the trial justice appropriately exercised his discretion in denying defendant's motion to sever.

## VI

### Life Without Parole Sentence

■■■ "Because this case involves the imposition of a sentence of life without the possibility of parole, it is incumbent upon this Court to exercise its own independent judgment and discretion in determining the appropriateness of the sentence." *Tassone*, 749 A.2d at 1119 (citing *State v. Travis*, 568 A.2d 316 (R.I.1990); *State v. Lassor*, 555 A.2d 339 (R.I.1989)). "To make such a determination, this Court

shall examine the record, the findings of the trial justice, and the personal character, record, and propensities of the defendant." *Tassone*, 749 A.2d at 1119 (citing *State v. Wilson*, 568 A.2d 764, 769 (R.I. 1990)).

After finding defendant guilty of murder in the first degree, the jury was further instructed to determine whether the murder was "committed in a manner involving torture or aggravated battery to the victim." G.L.1956 § 11–23–2(4). The jury concluded that it was. Thereafter, pursuant to G.L.1956 chapter 19.2 of title 12, the trial justice conducted the necessary sentencing hearing, during which the prosecutor emphasized the savage nature of the murder, the callous attitude of Casserly's assailants, and the effects of the crime upon the juvenile witnesses and participants. During his statement to the court, defendant admitted that he had a drug problem, but continued to maintain his claim of innocence, asserting that he had unfortunately been in the wrong place at the wrong time. Following the hearing, the trial justice sentenced defendant to life imprisonment without the possibility of parole, stressing the heinous nature of the offense and the fact that juveniles were encouraged to participate in the crime.

On appeal, defendant argued that § 12–19.2–4 requires that when the sentence of life without the possibility of parole is imposed, a trial justice is required to articulate the reasons for imposing that sentence sufficient for this Court to conduct an appropriate review. The defendant maintained that the trial justice failed to comply with this statutory mandate because he failed to consider the participation of each defendant separately and failed to articulate his reasons for the imposition of the sentence of life imprisonment without the possibility of parole.

Section 12–19.2–4, entitled "Consideration of aggravating and mitigating circumstances," requires, in pertinent part, that:

"At the presentence hearing * * * the court shall consider evidence regarding the nature and circumstances of the offense and the personal history, character, record, and propensities of the defendant which are relevant to the sentencing determination. After hearing evidence and argument regarding the aggravating and mitigating circumstances relating to the offense and the defendant, the court shall, in its discretion, sentence the defendant to life imprisonment without parole or to life imprisonment. The court shall state on the record its reasons for imposing its sentence."

Following argument by counsel for both the state and defendant and an impassioned statement by defendant, the trial justice made the following statement, which we restate now in its entirety:

"At best, these cases are very difficult. At least they are for me. The Court's impressed by Mr. Bustamante's addressing the Court. But I can't help recalling the testimony. There were 27 stab wounds; and encouraging babies—well, one wasn't a teenager even, to participate in this type of activity on both these defendants' parts.

"Mr. Bustamante, on Count 1, the Court sentences you to life imprisonment. That shall be without parole. On Count 2 the Court sentences you to ten years at the Adult Correctional Institution[s]. That is to run concurrent. Mr. Belloli, on Count 1 the Court sentences you to life without parole. On Count 2 the Court sentences you to ten years. That will be concurrent with the sentences you are presently serving. You both have objections."

Although the statement was not a model of detail and particularity, we conclude that the trial justice did satisfy, although with brevity, the requirements of § 12–19.2–4, and was not obligated to engage in a long oration about his rationale for imposing this sentence. The trial justice considered the nature and circumstances of the of-

fense, the statement by defendant and the fact that this crime included juveniles in its perpetration. Accordingly, we conclude that the trial justice did not fail to state his reasons for imposing a sentence of life without the possibility of parole. Moreover, in the exercise of our own independent judgment and discretion, we deem this sentence to be appropriate and just.

## CONCLUSION

For the foregoing reasons, the defendant's appeal is denied and the judgments appealed from are affirmed. The papers in this case are remanded to the Superior Court.